**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 95-30454
_____

BOSTON OLD COLONY INSURANCE CO.,

Plaintiff-Appellant,

VERSUS

THERMO PROCESS SYSTEMS, INC.;
TPS Technologies, Inc.; and Ronald Waligora,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Louisiana
(91-CV-905)
_____

July 31, 1996

Before WISDOM, EMILIO M. GARZA, and PARKER, Circuit Judges.

PER CURIAM:[*]

Boston Old Colony Insurance Company, the plaintiff-appellant, as the subrogee of its insured,

filed suit against the defendants-appellants to recover insurance proceeds that it paid to its insured.

---

[*] Pursuant to Local Rule 47.5, the Court has determined that this opinion should not be
published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

The district court ruled in favor of the defendants, prompting the plaintiff to file this appeal. Finding no error, we AFFIRM.

## I.

*Statement of Facts*

GDC Engineering, Inc. (GDC) contracted with Rubicon, Inc., a chemical manufacturer, to incinerate hazardous materials at Rubicon's plant (the site) in Geismar, Louisiana. On May 16, 1989, GDC entered into the Sales and Service Agreement (the agreement) with TPS Technologies, Inc. (TPST), which required TPST to design, manufacture, and deliver a portable incinerator capable of processing solid and liquid waste to GDC at the site.

Under the agreement, TPST agreed to supervise the "installation and start-up through the successful completion of the Trial Burns" of both the liquid and solid waste incinerators and to provide two "lead operators", one to be on call 24 hours per day, to act as technical advisors during this initial period. Article XIV of the agreement further provides:

> 14.1    GDC hereby indemnifies and hold TPST harmless from any and all claims, liability and damages, whether foreseeable or unforeseeable, including reasonable attorneys fees, to the extent such claims, liabilities, and damages arise out of (a) TPST's presence on the Site, (b) any deficiency in permitting the Project or the System, (c) claims by any person or entity relating to the hazardous materials located at the Site . . ., (d) any claim made by or acts or omissions of Rubicon or Rubicon's or GDC's agents or employees, (e) any cost incurred by TPST as a result of any suit, claim, protest, picket or civil commotion related to the Site or the Project, and (f) any tax liability of TPST . . . arising out of this transaction. In addition, GDC agrees to obtain from Rubicon the broadest possible indemnification (specifically extending to TPST) for any claims, loss or damages arising out of or in any way related to the hazardous materials at the Site . . ., any acts or omissions of Rubicon or its agents and employees . . . ."

Finally, the agreement also requires both GDC and TPST to obtain primary liability insurance with a $1 million per occurrence limit and umbrella liability insurance of $5 million. GDC obtained its insurance from the plaintiff, Boston Old Colony Insurance Company (BOC).

Thermo Process Systems, Inc. (Thermo), the parent corporation of TPST, supplied one of its employees, Ronald Waligora, to TPST to act as one of the lead operators. Waligora helped to design the incinerator, was thoroughly familiar with its operation, and trained GDC employees in the use of the incinerator.

By 1991, GDC was processing only liquid waste; the solid waste portion of the incinerator was not yet complete. On February 20, 1991, one of GDC's employees, George Daher, discovered a problem with the incinerator and placed the incinerator on "idle" while it awaited repairs.[1] Daher then asked Waligora to remove the defective part for offsite repair.

Waligora arrived at the site on the morning of February 22, 1991. He checked the log book and the instrument panel, satisfying himself that the incinerator was receiving proper water flow for cooling. Waligora failed to discover, however, that only one of the cooling water supply lines was operational because GDC had shut down the other lines. When Waligora then turned off the electricity to the defective part, power was also cut to the only operational cooling water supply line. As a result, the incinerator overheated and ignited, sustaining substantial damage.

---

[1]     TPST advised against idling the incinerator in such a situation, recommending instead a controlled shutdown of the incinerator in which the incinerator is slowly cooled and turned off. Because it takes a longer time to restart processing once the incinerator has been shutdown than when it has been idling, GDC elected to idle the incinerator. Waligora was aware of this fact.

After the fire, TPST and GDC entered into a settlement agreement, which was "to resolve all of the claims they [had] respecting the disputes referred to [in the settlement agreement] and all of the other differences between them arising from the Sale and Service Agreement, the past operation of the System, and the fire".  Subsequently, BOC paid GDC $501,000 pursuant to the insurance policy and BOC then filed suit, as GDC's subrogee, against the defendants to recover that amount.

*Procedural History*

BOC filed suit against the defendants in Louisiana state court, alleging that Waligora, as an employee of Thermo and TPST's borrowed employee, negligently caused the incinerator to catch fire. BOC further argued that Thermo and TPST are vicariously liable for the negligent action of their employee, Waligora.

Asserting diversity of jurisdiction, the defendants removed the suit to federal district court. The defendants then moved for summary judgment on the basis that the indemnity clause in the agreement barred BOC's claims.  BOC opposed this motion and cross-filed its own motion for summary judgment.  The district court denied both motions.

After a three-day trial, the district court ruled that although Waligora's negligence is partially responsible for the fire, subpart (a) of the indemnity clause in the agreement shielded the defendants from BOC's suit.  The district court further ruled that the settlement agreement was not an obstacle to BOC's suit because the parties did not intend that the settlement agreement would affect BOC's rights.  Finally, the district court also held that BOC's claims against Thermo and Waligora, in his individual capacity, were meritless.  BOC appeals this judgment.

II.

Under Louisiana law, which is applicable in this case, the question whether a contract is ambiguous is a question of law.[2] Accordingly, the district court's interpretation of the contract is subject to de novo review, unless "factual findings are pertinent to the interpretation", in which case "those factual findings are not to be disturbed unless manifest error is shown".[3]

"A contract of indemnity whereby the indemnitee is indemnified against the consequences of his own negligence is strictly construed, and such a contract will not be construed to indemnify an indemnitee against losses resulting to him through his own negligent act, unless such an intention was expressed in unequivocal terms."[4] It is not necessary, however, that the contract specifically refer to the negligence of the indemnitee in order for the indemnity provision to be effective; no magic words are required.[5] If the words of the contract are "clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent".[6] If the indemnity provision is unclear, the court must apply general rules of contract interpretation to the indemnity provision to determine the common intent of the parties.[7] The court must then interpret

---

[2]      Amoco Prod. Co. v. Fina Oil & Chem. Co., 670 So. 2d 502, 512 (La. Ct. App. 1996), writ denied, No. 96-1024, 1996 WL 292009 (La. May 31, 1996).

[3]      Id. at 512-13.

[4]      Polozola v. Garlock, Inc., 343 So. 2d 1000, 1003 (La. 1977).

[5]      Polozola v. Garlock, Inc. (Polozola II), 376 So. 2d 1009, 1014-15 (La. Ct. App. 1979), writ denied, 379 So. 2d 1003 (La. 1980).

[6]      Amoco Prod. Co., 670 So. 2d at 511.

[7]      Sovereign Ins. Co. v. Texas Pipe Line Co., 488 So. 2d 982, 984 (La. 1986); Polozola, 343

the indemnity provision in the light of the contract as a whole, avoiding interpretations that render other portions of the contract "virtually nugatory".[8] The court may also consider parole evidence to determine the parties' intent.[9] Under no circumstances, however, may usage, custom, or equity play a role in the determination of whether the indemnity agreement extends to the indemnitee's negligence.[10] If the parties' intention is still equivocal after applying these general rules of contract interpretation, then a presumption is raised that the parties did not intend to indemnify the indemnitee from liability from his own negligent acts.[11]

Reading the indemnity clause in the instant case in isolation, we cannot find that it unequivocally reveals that the parties' common intent was to indemnify TPST from its own negligence; however, reading this provision in the light of the contract as a whole, we cannot discern any other possible intent. The agreement plainly requires TPST to "design, develop, manufacture and deliver the [incinerator] System, and provide ancillary services relating to the System". The

---

So. 2d at 1003; Yocum v. City of Minden, 566 So. 2d 1087, 1086 (La. Ct. App. 1990); see also Home Ins. Co. v. National Tea Co., 588 So. 2d 361, 364 (La. 1991).

[8] Polozola, 343 So. 2d at 1003; see also Home Ins. Co., 588 So. 2d at 364.

[9] See, e.g., Amoco Prod. Co. v. Forest Oil Co., 844 F.2d 251, 257-58 (5th Cir. 1988) (referring to the parties' trial testimony); Polozola II, 376 So. 2d at 1016 (referring to the parties' stipulated facts). The plaintiff contends that the district court's stated reliance upon extrinsic evidence renders its judgment erroneous. As explained above, such reliance is not misplaced and is permitted under Louisiana law. We, however, do not find that it is necessary to go beyond the four corners of the agreement to ascertain its meaning.

[10] Sovereign Ins. Co., 488 So. 2d at 985.

[11] Id. at 985-86.

-6-

agreement further contemplates that TPST will be present at GDC's site when it sets up the incinerator and for the two lead operators, who are TPST employees, to have an ongoing presence at the site. The parties, then, clearly contracted for TPST's presence at the site.

BOC argues that merely contracting for TPST to perform work at the site and a provision indemnifying TPST from claims arising out of TPST's "presence" does not unequivocally demonstrate that TPST's negligence is indemnified. In support of this argument, BOC first contends that subpart (d) of the indemnity provision[12] is the only clause indemnifying anyone's negligence and that the failure to include TPST's acts or omissions in this clause indicates that TPST is not indemnified for its negligence. BOC also asserts that reading subpart (a) to cover TPST's negligence renders subpart (d) superfluous because any claim that could arise under subpart (d) would already be covered by subpart (a). Second, BOC argues that the agreement's warranty provision would be rendered nugatory if subpart (a) indemnifies TPST's negligence. Finally, BOC offers an explanation for the actual purpose of subpart (a): to indemnify TPST from shotgun lawsuits in which TPST is named as a party to a suit merely because it was present at the time of the incident that provoked the suit. We find BOC's suggested interpretation unconvincing.

Notably absent from subpart (d) of the indemnity clause is any reference to claims from GDC itself; thus, subpart (a) indemnifies TPST from certain claims raised by GDC itself that would not be covered under subpart (d). BOC's "shotgun lawsuit" theory does not explain this arrangement. For example, consider that a hypothetical third party is injured at the Rubicon site while making a delivery and the delivery person then files suit, naming everyone present at the site, including TPST. If, at

---

[12]    Subpart (d) indemnifies TPST from "any claim made by or [that arises from] acts or omissions of Rubicon or Rubicon's or GDC's agents or employees".

trial, TPST's negligence is found to have been a legal cause of the delivery person's injury, then under BOC's reading of the contract, TPST would be liable because subpart (a) does not indemnify TPST for its own negligence. If, however, TPST is found not to have been negligent, then BOC's interpretation would hold that subpart (a) shields TPST, though in this case TPST would have no liability because TPST was not negligent. Thus, under BOC's arguments, subpart (a) operates to indemnify TPST only when it has no liability. Such an outcome is clearly absurd.

Subpart (a) makes sense only if it is interpreted to indemnify TPST for the negligence of its employees who are working at the site. Consider the following scenario: The incinerator simply catches fire, but not because of Waligora's negligence, and the fire damages some of GDC's other equipment, burns a portion of Rubicon's facilities, and injures Rubicon and GDC employees. In this scenario, it is likely that all injured parties, which would include Rubicon, GDC, and their employees, would sue TPST. Subpart (d) would shield TPST only from the suits filed by Rubicon and the employees of both Rubicon and GDC. The warranty provision, if still in effect,[13] in the contract would give GDC a remedy against TPST only for the damage to the incinerator but does not give GDC any right to consequential damages, such as its costs to repair its other damaged equipment and its lost profits. Accordingly, GDC could then sue TPST under other theories, such as for negligence in designing the incinerator, to recover from TPST the cost of its damages to its equipment and presumably for other consequential damages. TPST could not use subpart (a) as a shield in this situation because a defective incinerator would not constitute TPST's "presence at the Site" and TPST likely would have to file with its insurer to cover the losses to GDC, thereby explaining the

_____

[13]     In the facts before us, the warranty already had expired on the operational portion of the incinerator that caught fire.

requirement that both TPST and GDC obtain insurance.[14]  Under this interpretation, all components of the contract are given their logical meaning and no absurd consequences result.  Accordingly, we reach the same result as the district court and conclude that the plaintiff's claim is barred by subpart (a) of the indemnity agreement, which indemnifies TPST for its negligence at the site.

### III.

BOC also attempts to place liability upon Thermo and Waligora separately.  Under the agreement, Thermo guaranteed TPST's obligations to GDC.  A contract of guarantee is the same as a contract of surety[15] and "suretyship may be established for any lawful obligation".[16]  The Louisiana Civil Code allows the surety to raise "any defense to the principal obligation that the principal obligor could assert" against the creditor.[17]  Thermo sent Waligora to the site to fulfill TPST's contractual obligation to GDC to provide two lead operators to the site.  Thermo acted to secure TPST's compliance with the agreement and, accordingly, is entitled to raise the indemnity clause as a defense to BOC's suit.

BOC next attempts to hold Waligora individually liable for the damage that his negligence caused.  Under Louisiana law, "employees and agents owe no duties to third parties, and cannot be

---

[14]    See Polozola II, 376 So. 2d at 1015 (holding that an indemnity agreement that requires one party to purchase insurance supports a finding that the party required to purchase the insurance intended to indemnify the other party from that party's own negligence).

[15]    Commercial Nat'l Bank v. Keene, 561 So. 2d 813, 815 (La. Ct. App. 1990).

[16]    LA. CIV. CODE ANN. art. 3036 (West 1994).

[17]    Id. art. 3046.

found liable to third parties for their negligent acts or omissions in the commercial context".[18]  As a result, BOC cannot hold Waligora individually liable for the negligence that he committed in furtherance of his duties as an employee, which caused only economic damage to GDC.

IV.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

[18]     Korson v. Independence Mall I, 595 So. 2d 1174, 1178 (La. Ct. App. 1992); see also Unimobil 84 v. Spurney, 797 F.2d 214, 217 (5th Cir. 1986) (holding that Canter v. Koehring Co., 283 So. 2d 716 (La. 1973), only permits officers to be individually liable for their negligence that results in bodily, but not commercial, injury to a third party).